```
_____
                              )
CYNTHIA ARTIS, et al.,        )
                              )
            Plaintiffs,       )
                              )
        v.                    )    Civil Action No. 01-400 (EGS)
                              )
JANET L. YELLEN,              )
                              )
            Defendant.        )
_____)
```

## MEMORANDUM OPINION

Plaintiffs bring this lawsuit on behalf of a putative class of African-American and Native-American secretaries and clerical employees currently or formerly employed by the Board of Governors of the Federal Reserve System ("Federal Reserve Board") who allege that they have suffered racial discrimination. The parties to this case have engaged in a prolonged period of class discovery, during which the plaintiffs largely refused to respond to written discovery requests and declined entirely to appear for depositions. As a result, the Court compelled their participation in discovery.

After class discovery closed, plaintiffs asserted that the defendant had wrongly withheld certain information. The Court rejected these arguments in 2012, when plaintiffs filed a motion to compel and failed to identify any discovery request to which the defendant did not properly respond. Plaintiffs repeatedly

sought reconsideration of that Order. Each time, they made arguments that the Court had previously rejected or that could have been raised in the original motion to compel. Plaintiffs' motion for class certification contains yet more requests for reconsideration of these discovery rulings.

Once those arguments are cleared away, little remains of plaintiffs' motion, which cited not a single legal decision related to Federal Rule of Civil Procedure 23. Indeed, plaintiffs presented almost no evidence or argument regarding Rule 23. The Court has examined the record and found nothing to indicate that plaintiffs' injuries stem from any common action, policy, or practice of the Federal Reserve Board, and the testimony of each plaintiff confirms that their claims are unique and individualized. Accordingly, upon consideration of the motion for class certification, the response and reply thereto, the applicable law, and the entire record, the Court **DENIES** plaintiffs' motion. The Court also considers the plaintiffs' motion to supplement the record, the response and reply thereto, and **DENIES** that motion.

I.  **Background**

  A.    **The Federal Reserve Board's Personnel Practices.**

The Federal Reserve Board is an independent federal agency that is organized into ten divisions and five offices. *See* Declaration of Christine M. Fields ("Fields Decl."), ECF No.

213-2 ¶¶ 4-5, 7. Each division is managed by a Division Director, who is "afforded considerable autonomy in regard to the structure, staffing and operation of their Division." *Id.* ¶ 6. Accordingly, "personnel practices in regard to such things as performance evaluations, promotions, and selections for vacant positions can and do vary significantly from division to division." *Id.* This applies to a variety of practices:

- <u>Supervision</u>: The manner in which secretaries and clerical staff are supervised varies widely. "In some divisions, one manager is responsible for supervision of all secretaries and clerical workers . . . [i]n others, supervision of secretaries and clerical workers is divided up among several or many managers." *Id.* ¶ 9.

- <u>Performance Evaluations</u>: All Federal Reserve Board employees are reviewed annually, but "[e]ach Division Director determines the evaluation format as well as the structure [of the evaluation]." *Id.* ¶¶ 10-11. In some, a clerical worker may receive an evaluation that is the result of input from each individual that worker supports; in others, a single individual may complete the evaluation. *See id.* ¶ 11.

- <u>Salary and Cash Awards</u>: Federal Reserve Board employees are compensated with a salary, which may be increased by merit increases. *See id.* ¶ 12. Employees may also be given cash awards "at the discretion of their respective Division Director." *Id.; see also id.* ¶ 13 ("In some divisions, the Division Director may tie these awards to . . . performance ratings while in other divisions the Division Director may earmark cash award funds to reward successful completion of specific projects.").

- <u>Promotions</u>: Promotion decisions are also delegated to the individual Division Director. *See id.* ¶ 16. "Employees . . . are not promoted on any fixed schedule but rather are promoted based on the performance criteria set by the division, the needs of the division and the individualized assessment of the secretarial and clerical employee's skills and performance." *Id.*

Although the preceding personnel decisions are largely within the discretion of lower-level managers, the Federal Reserve Board has a general Equal Employment Opportunity policy, which provides that "the Board prohibits discrimination in employment on the basis of race, color, religion, sex, national origin, age, disability, or genetic information, and promotes the full realization of equal employment opportunity . . . through a continuing affirmative program." *Id.* ¶ 8.

**B.    The Plaintiffs and Their Claims.**

Of the sixteen plaintiffs who brought this lawsuit, fourteen remain in the case.[1] They are each secretaries or clerical employees currently or formerly employed by the Federal Reserve Board. *See* Fourth Am. Compl., ECF No. 127 ¶ 5. All are African-American, except for Linda Proctor, who is a Native American. *See id.* ¶¶ 5, 44. The plaintiffs propose to bring a class challenge to the defendant's allegedly discriminatory treatment of African-American and Native-American secretaries and clerical employees. Plaintiffs claim that the class has experienced discrimination in five areas: salary, cash awards, promotions, performance reviews, and career-transition agreements. Plaintiffs never tie these allegations to any common cause, however, and each plaintiff's experience differs substantially.

---

[1] Donna Love-Blackwell's claims were dismissed on April 5, 2013. *See* Order, ECF No. 178. Plaintiffs now request that Crystal Clay be dismissed and the Court **GRANTS** that request.

No plaintiff appears to assert discrimination in connection with all five practices, and many admit to having no evidence that they were treated unfavorably in connection with one or more of the challenged practices. All but Linda Proctor either did not receive a career-transition agreement or did not allege discrimination in connection with one.[2] Nine plaintiffs testified that most or all of their performance reviews were fair. *See* Adams Dep. at 56:9–11; Cohen Dep. at 80:2–5; Dorey Dep. at 62:8–63:19; Ellis Dep. at 303:21–304:3; Hill Dep. 227:19–228:8; Logan Dep. at 229:10–14; Matthews Dep. at 113:5–12; Deposition of Linda Proctor ("Proctor Dep."), ECF No. 213-1 at 57:22–58:3; Williams Dep. at 18:11–18. Five plaintiffs testified that they did not allege discrimination in connection with salary increases, or that they could not identify any Caucasian employee who was paid more. *See* Cohen Dep. at 77:11–14, 118:8–

---

[2] *See* Deposition of Tracy Newton-Adams ("Newton-Adams Dep."), ECF No. 213-1 at 23:23–24:1; Deposition of Cynthia Artis ("Artis Dep."), ECF No. 213-1 at 338:18–339:8; Deposition of Barbara Carter ("Carter Dep."), ECF No. 213-1 at 126:7–9; Deposition of Sheryl Cohen ("Cohen Dep."), ECF No. 213-1 at 115:3–10; Deposition of Donna Dorey ("Dorey Dep."), ECF No. 213-1 at 158:19–159:5; Deposition of Sharon Ellis ("Ellis Dep."), ECF No. 213-1 at 301:3–5; Deposition of Kimberly Hardy-Barnes ("Hardy-Barnes Dep."), ECF No. 213-1 at 136:4–15; Deposition of Earnestine Hill ("Hill Dep."), ECF No. 213-1 at 233:17–21, 274:5–11; Deposition of Sharon Logan ("Logan Dep."), ECF No. 213-1 at 272:15–273:5; Deposition of Kathleen Matthews ("Matthews Dep."), ECF No. 213-1 at 122:18–19; Deposition of Michelle McGhee ("McGhee Dep."), ECF No. 213-1 at 144:16–145:14; Deposition of Georgianna Terrell ("Terrell Dep."), ECF No. 213-1 at 65:15–18; Deposition of Yvette Williams ("Williams Dep."), ECF No. 213-1 at 33:22–35:16.

11; Dorey Dep. at 49:8–10; Hill Dep. at 78:13–16; Matthews Dep. at 87:15–22; McGhee Dep. at 98:22–99:3. With respect to cash awards, six plaintiffs were unsure if anyone had received higher awards than they had. *See* Adams Dep. at 49:24–50:1; Cohen Dep. at 78:5–9; Dorey Dep. at 49:5–7; Matthews Dep. at 98:5–7; McGhee Dep. at 69:21–70:6; Terrell Dep. at 84:15–18. Finally, many plaintiffs testified that they were regularly promoted, including one who was promoted into a management position, another who was promoted to the highest secretarial position in her department, and a third who never applied for a promotion. *See* Artis Dep. at 129:18–21; Ellis Dep. at 216:17–217:8; Hardy-Barnes Dep. at 85:2–7; Hill Dep. at 344:2–22; Williams Dep. at 33:3–12.

Plaintiffs also provide no evidence to show that their claims of individual discrimination stem from a common source. The record contains excerpts of the plaintiffs' depositions, which confirm that decisions related to the challenged practices are devoted to the discretion of dozens, if not hundreds, of low-level supervisors, who act in a largely subjective manner. *See, e.g.*, Artis Dep. at 158:12–19 (decisions were "subjective amongst the mangers"; "it all depended on what manager you worked for").[3] For example, testimony revealed that the process

---

[3] *See also id.* at 99:1–12, 147:4–8, 206:8–9, 258:1–3, 329:1–7; Ellis Dep. at 256:15–18 (treatment is "very subjective based on

for making decisions regarding cash awards varied substantially. *See* Hill Dep. at 270:7-16 (each Division "makes their own choice" regarding cash awards); Carter Dep. at 70:19-71:6 (in the Audit Review Section of the Bank Operations Division, cash awards are "very rare"); Ellis Dep. at 208:16 (in the Legal Division, "everybody gets cash awards"). Nor is there evidence that all supervisors act in a uniform manner. Many plaintiffs stated that some of their supervisors discriminated against them, but that many did not.[4]

**C. The History of This Lawsuit.**

This case has its roots in a lawsuit that was filed in 1996. *See Artis v. Greenspan*, No. 96-2105 (D.D.C. filed Sept. 11, 1996). In that case, a group of African-American secretaries employed by the Legal Division of the Federal Reserve Board

---

your manager"); Hardy-Barnes Dep. at 20:16-21:5 (the Federal Reserve Board had a "totally . . . subjective policy," which "depends on each individual supervisor . . . to apply that policy to their employees"); Hill Dep. at 230:22-231:3; Logan Dep. at 75:13-76:3, 103:16-19, 230:1-3, 274:19-22 (supervisors' decisions were "very subjective," including decisions regarding cash rewards, merit increases, and performance reviews); Williams Dep. at 47:8-12.

[4] *See* Artis Dep. at 208:2-6; Carter Dep. at 29:3-9; Cohen Dep. at 111:10-19; Dorey Dep. at 31:6-20, 58:4-8, 105:13-17, 125:5-11, 187:5-16; Ellis Dep. at 257:14-21; Hardy-Barnes Dep. at 21:12-15; Hill Dep. at 210:17-211:2, 212:22-213:7, 230:22-231:3, 248:6-7; Logan Dep. at 62:7-9, 178:20-179:2, 187:4-12, 189:13-22, 196:7-9, 206:15-20, 216:8-17, 220:12-20, 255:3-256:3; Matthews Dep. at 34:16-35:16, 55:18-56:6, 109:19-22; McGhee Dep. at 75:16-22, 89:20-90:3, 164:14-18, 187:19-188:3; Terrell Dep. at 101:9-18.

alleged that they had suffered racial discrimination. The
district court dismissed that case for failure to exhaust
administrative remedies and the D.C. Circuit affirmed. *See Artis
v. Greenspan*, 158 F.3d 1301 (D.C. Cir. 1998). In the wake of
that dismissal, plaintiffs filed this case.[5]

The Federal Reserve Board quickly moved to dismiss for failure
to exhaust administrative remedies. In light of factual disputes
regarding administrative counseling sessions that were relevant
to that motion, this Court found it "appropriate to permit
plaintiffs to conduct . . . limited . . . discovery" on the
topic. *Artis v. Greenspan*, 223 F. Supp. 2d 149, 155 (D.D.C.
2002). After contentious discovery, the defendant renewed its
motion to dismiss. *See* Second Mot. to Dismiss, ECF No. 40.

On January 31, 2007, this Court granted the defendant's
motion. *See Artis v. Greenspan*, 474 F. Supp. 2d 16 (D.D.C.
2007). The Court denied plaintiffs' motion for reconsideration
of that decision on March 2, 2009. *See Artis v. Bernanke*, 256
F.R.D. 4 (D.D.C. 2009). Plaintiffs appealed these Orders and the
D.C. Circuit reversed. *See Artis v. Bernanke*, 630 F.3d 1031
(D.C. Cir. 2011). After the Circuit's Mandate issued, the
parties submitted proposed schedules for further proceedings and

---

[5] The plaintiffs filed an earlier, all but identical, lawsuit on
August 3, 1999. *See Artis v. Greenspan*, No. 99-2073 (D.D.C.
filed Aug. 3, 1999). The cases were ultimately consolidated
under this case number. *See* Order, ECF No. 8.

this Court issued a Scheduling Order. *See* Scheduling Order, ECF No. 95. That Order divided the case into three phrases, the first of which was class certification. *Id.* at 2. The Court scheduled class discovery to last until July 31, 2012, and defined it to include "any discovery that is relevant under Fed. R. Civ. P. 26, to class certification issues arising under Fed. R. Civ. P. 23." *Id.* at 2, 3.

### D.    The Class Discovery Period.

During class discovery, the plaintiffs largely failed to respond to the defendant's discovery requests and refused entirely to appear for properly noticed depositions. Plaintiffs also "did not notice any depositions and, specifically, did not seek to take a Rule 30(b)(6) deposition." Order, ECF No. 184 at 2. Plaintiffs did submit three sets of written discovery requests to the defendant, however. The Federal Reserve Board provided written responses to each set, and raised various objections to many of plaintiffs' requests. *See* Def.'s Responses to Pls.' First Set of Written Discovery, ECF No. 212-4; Def.'s Responses to Pls.' Second Set of Written Discovery, ECF No. 212-5; Def.'s Response to Pls.' Third Set of Written Discovery, ECF No. 212-6. Defendant also conducted a rolling document production, which culminated in the production of personnel data from the years 1988–2011. *See* Letter, ECF No. 128-6 at 2.

Both parties approached the close of class discovery dissatisfied. On July 27, 2012, the defendant moved to compel the plaintiffs to provide full written responses to discovery requests and to appear for depositions. *See* Mot. to Compel, ECF No. 120. On August 17, 2012, plaintiffs moved to compel the defendant to provide additional personnel data and to hold an informal conference regarding its data, but they identified no discovery request to which defendant had not properly responded. *See* Pls.' Mot. to Compel, ECF No. 123. The Court addressed these motions during a hearing on October 10, 2012, which was summarized in a subsequent Order:

> [T]he Court granted defendant's motion to compel plaintiffs' depositions and other discovery requests with which plaintiffs did not comply. The Court denied plaintiffs' cross-motion to compel, finding that plaintiffs had not properly requested the information that they alleged had been withheld. With respect to plaintiffs' arguments regarding a "conference" with certain employees of defendant, the Court found that plaintiffs had not properly noticed the deposition of those employees. The Court noted that plaintiffs had not served a 30(b)(6) notice of deposition, which would have been a possible avenue for obtaining such information.

Order, ECF No. 184 at 2-3; *see also* Order, ECF No. 139 (memorializing the Court's October 10, 2012 oral rulings).[6] Even during the October 10, 2012 hearing, plaintiffs "did not attempt

---

[6] During the October 10, 2012 hearing, the Court also ordered plaintiffs' counsel to pay defendant's expenses, including attorneys' fees, incurred in relation to plaintiffs' failures to produce documents and appear for depositions and in litigating the defendant's motion to compel. *See* Order, ECF No. 139 at 2.

to identify any discovery requests to which defendant failed to respond." Order, ECF No. 199 at 2.

On October 22, 2012, even though class discovery had closed three months earlier, the plaintiffs moved for leave to take five depositions. *See* Pls.' Mot. to Take Depositions, ECF No. 140. The Court granted this request in part, "permit[ting] plaintiffs to serve one out-of-time Rule 30(b)(1) or 30(b)(6) notice of deposition on defendant, subject to . . . limitations." Minute Order of November 20, 2012. The Court limited the scope of the deposition to questions about (1) data previously produced by the Federal Reserve Board and (2) documents that were not produced but had allegedly been properly requested in timely served document requests. *See id.*

On December 19, 2012, the defendant moved for a protective order, arguing that plaintiffs had issued a deposition notice that did not comply with these limitations. *See* Def.'s Mot. for Protective Order, ECF No. 160. This Court agreed, noting that plaintiffs' notice "far exceed[ed]" the limitations. *See* Minute Order of January 18, 2013. The Court permitted the plaintiffs to try again, gave detailed guidance as to the proper form for the notice, and emphasized that "[t]his will be plaintiffs' final opportunity . . . . If the revised 30(b)(6) notice fails to comply with this Order, it will be stricken with prejudice." *Id.*

On February 12, 2013, the defendant moved for a protective order regarding plaintiffs' revised notice. *See* Def.'s Second Mot. for Protective Order, ECF No. 169. This Court found that the amended notice was "a confusing collection of allegations, cross-references, and attachments," which "request[ed] information far beyond the scope of the Court's Orders." Order ECF No. 184 at 11, 12. The Court reiterated that it had imposed limitations on the scope of the deposition for a reason: "Plaintiffs forfeited the right to seek depositions on broad-ranging topics relevant to class certification when they failed to serve a single notice of deposition during the class discovery period." *Id*. at 14.[7] Accordingly, the Court granted the defendant's second motion for a protective order, recognized the "heavy burden placed on defendant in having to respond to

---

[7] The Court also rejected plaintiffs' argument that they could take unlimited discovery due to the D.C. Circuit's prior opinion in this case. *See id.* at 14–15. In the passage cited by plaintiffs, the D.C. Circuit stated that government agencies ought not "demand[] excessively detailed support for a class-wide complaint alleging a pattern and practice of subtle financial and professional discrimination" in connection with any administrative counseling requirement. *Artis*, 630 F.3d at 1035 (citations omitted). Requiring such support would put the cart before the horse, the Circuit found, because "class-wide claims of systemically depressed salaries, performance ratings, advancement opportunities, and the like can often be proven only by a statistical comparison of the employer's treatment of the class to its treatment of non-minority employees[, which] [u]sually . . . will be possible only after the employees obtain data from their employer, whether informally or through discovery." *Id.* "What is implicit in this statement," this Court emphasized, "is that the discovery must be properly requested." Order, ECF No. 184 at 14–15.

plaintiffs' successive, failed attempts to serve a Rule 30(b)(6) Notice of Deposition," and concluded that "plaintiffs have had enough opportunities to formulate a proper 30(b)(6) Notice" and therefore "are not entitled to any further opportunities to amend their 30(b)(6) Notice." *Id.* at 15, 16.

As they were seeking to take untimely depositions, plaintiffs also sought reconsideration of the Court's October 10, 2012 Order denying their motion to compel. Their first request largely raised arguments this Court had previously rejected. *See* Pls.' Mot. to Reconsider, ECF No. 141. In denying that motion, the Court also rejected plaintiffs' request for "an evidentiary hearing to allow their expert to explain precisely why plaintiffs claim that the electronic data already produced is 'unusable.'" Order, ECF No. 194 at 8. The Court noted that plaintiffs' motion to compel "did not set forth in any detail why the data was unusable or why the Board's production was otherwise deficient" and "failed to specify a discovery request to which the Board failed to respond." *Id.* Thus, "[a]s a result of plaintiffs' failure to timely and properly raise their objections to the Board's data production, plaintiffs are now foreclosed from continuing to do so." *Id.* at 9.

Dissatisfied, the plaintiffs moved to reconsider once more on August 6, 2013. *See* Second Mot. to Reconsider, ECF No. 196. The Court denied this motion on August 28, 2013:

> Although styled as such, plaintiffs' motion is clearly not one for reconsideration. The motion either raises arguments that should have been, but were not, raised in plaintiffs' underlying motion or their first motion for reconsideration, or merely repeats arguments that the Court has already considered and rejected. This approach, pursued by plaintiffs several times in this case, is a waste of judicial resources and the resources of defendant, a government entity.

Order, ECF No. 199 at 3-4. The Court also addressed plaintiffs' newfound argument "that they have recently 'discovered' that defendant has withheld the production of 'job codes' from previous data." *Id.* at 5. "Even if this were true," this Court held, "it does not serve as a basis for reconsideration":

> The Court did not deny [plaintiffs'] motion to compel on the grounds that job code information did not exist or was not in the possession of [defendant]. The Court denied the motion [to compel] because plaintiffs failed to set forth any properly-served discovery requests to which defendant failed to respond. Although plaintiffs purport to attach copies of properly-served discovery requests that requested job codes to the pending motion, which is the third attempt by plaintiffs to litigate this specific discovery issue, it is too late. Even if those documents did reflect discovery that was requested but not produced, plaintiffs cannot use a motion for reconsideration to argue issues that could have been raised earlier, but were not.

*Id.* at 5.

On October 8, 2013, the plaintiffs attempted to appeal these discovery orders by moving to enforce the D.C. Circuit's mandate reversing this Court's decision granting the defendant's motion to dismiss. *See* Mot. to Enforce, *Artis v. Bernanke*, No. 09-5121, Doc. 1460265 (D.C. Cir. Oct. 8, 2013). On November 26, 2013, the

14

Circuit denied the motion. *See* Order, *Artis v. Bernanke*, No. 09-5121, Doc. 1468033 (D.C. Cir. Nov. 26, 2013).

### E. Plaintiffs' Motion for Class Certification

On January 3, 2014, plaintiffs filed their motion for class certification. *See* Mot. to Certify Class ("Mot."), ECF No. 211. Although plaintiffs attached exhibits to that motion, they filed additional exhibits—and another motion for class certification—on January 6, 2014. *See* Suppl. Mot. and Exhibits, ECF No. 212.[8] The Federal Reserve Board filed its opposition on February 10, 2014. *See* Opp. to Mot. to Certify Class ("Opp."), ECF No. 213. Plaintiffs filed their reply brief on March 28, 2014. *See* Reply in Supp. of Mot. ("Reply"), ECF No. 219. Yet again, plaintiffs filed an untimely second reply brief and an accompanying exhibit. *See* Errata, ECF No. 220.[9]

---

[8] Plaintiffs have repeatedly wasted this Court's and the defendant's time and resources by filing timely, but incomplete, versions of pleadings and then filing one or more untimely "corrected" versions. In accordance with the Court's December 4, 2012 Minute Order, which required the plaintiffs to seek leave of Court before filing untimely errata, the Court **ORDERS** that the brief filed on January 6, 2014 as ECF No. 212 be **STRICKEN FROM THE DOCKET**. The exhibits thereto may remain part of the record, but plaintiffs are warned that future failures to comply with Court Orders may result in this case being dismissed with prejudice. *See, e.g.*, *Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 167-68 (D.C. Cir. 1990); Fed. R. Civ. P. 41(b).

[9] In accordance with this Court's December 4, 2012 Minute Order, the Court **ORDERS** that the brief filed on March 29, 2014 as ECF No. 220 be **STRICKEN FROM THE DOCKET**.

On May 1, 2014, plaintiffs filed a motion seeking to supplement the record with yet another untimely exhibit. *See* Mot. to Suppl., ECF No. 221. Defendant filed its opposition on May 14, 2014. *See* Opp. to Mot. to Suppl., ECF No. 222. Plaintiffs filed their reply brief on May 21, 2014. *See* Reply in Supp. of Mot. to Suppl., ECF No. 223.

## II. Preliminary Matters

### A. Plaintiffs' Motion to Supplement the Record is Denied.

"A Scheduling Order is intended to serve as the unalterable road map (absent good cause) for the remainder of the case." *Dag Enter., Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 104 (D.D.C. 2005) (quotation marks omitted). It "'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Id.* (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992)). On July 21, 2011, the Court set a schedule for the completion of the class-certification portion of this case. *See* Scheduling Order, ECF No. 95. Plaintiffs' repeated requests for reconsideration of this Court's discovery orders necessitated a one-year delay in that schedule and the Court ultimately ordered the plaintiffs to submit their expert report by September 3, 2013, to make their expert available for a deposition by September 30, 2013, and to file their motion for class certification by January 3, 2014. *See* Minute Order of July 8, 2013. Although plaintiffs submitted

an expert report on September 3, 2013, they also submitted an
updated report on September 30, 2013. *See* Mot. for Extension,
ECF No. 204 at 1. In exchange for a continuation of the expert's
deposition, the defendant agreed not to object to the untimely
report. *See id.* The Court accepts the parties' agreement with
respect to the first untimely report, but plaintiffs' May 1,
2014 motion, which seeks to supplement the record with yet
another updated expert report and is opposed by the defendant,
asks too much. That report was filed eight months after the
deadline for the submission of expert reports, seven months
after the deposition of plaintiffs' expert, and over one month
after the motion for class certification became ripe.

   "A party must make [expert] disclosures at the times and in
the sequence that the court orders." Fed. R. Civ. P.
26(a)(2)(D). The purpose of that Rule is to "prevent[] experts
from lying in wait to express new opinions at the last minute,
thereby denying the opposing party the opportunity to depose the
expert on the new information or closely examine the expert's
new testimony." *Minebea Co. v. Papst*, 231 F.R.D. 3, 5 (D.D.C.
2005) (quotation marks omitted); *see also Coles v. Perry*, 217
F.R.D. 1, 4 (D.D.C. 2003). Plaintiffs have done just that,
springing a new report well after the defendant deposed their
expert and briefed the motion for class certification. As a
sanction for failing to follow this rule, Federal Rule of Civil

Procedure 37(c)(1) provides that "the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure [to disclose] was substantially justified or is harmless." The production of a new expert report that raises new theories after a motion for class certification has been fully briefed is not harmless. It forces the defendant either to forfeit the ability to address the report, or to depose the new expert and brief the motion for class certification anew. Nor have plaintiffs offered a reasonable justification for their delay.

An untimely expert report could be excused by Federal Rule of Civil Procedure 26(e), which "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Richardson v. Korson*, 905 F. Supp. 2d 193, 199 (D.D.C. 2012) (quotation marks omitted). Plaintiffs do not argue, nor could they, that their report seeks only to correct inaccuracies. Nor is the information on which the report relies new, notwithstanding plaintiffs' assertion that the report is based on "newly discovered evidence." Mot. to Supp., ECF No. 221 at 1. In fact, the report is based on the same data the Federal Reserve Board produced to the plaintiffs in May 2012. For that

reason, the Court **DENIES** plaintiffs' motion to supplement.[10] For

the same reason, the two-page "expert report" attached to

plaintiffs' reply brief in support of their motion to compel and

dated March 28, 2014, Ex. A to Pls.' Reply, ECF No. 220-1, is

also untimely and is **STRICKEN FROM THE DOCKET**.

## B. Courts May Address Class Certification Before the Merits.

Plaintiffs assert that this Court has wrongly forced them to

demonstrate their entitlement to class certification prior to

adjudicating the merits of their claims. *See* Mot. at 13. This

claim is baseless. Federal Rule of Civil Procedure 23 requires

the Court, at "an early practicable time," to "determine by

order whether to certify the action as a class action." Fed. R.

Civ. P. 23(c)(1)(A). This Court's Local Rules further expedite

the process by requiring the filing of a motion for class

certification "[w]ithin 90 days after the filing of a complaint

---

[10] The Court also has serious doubts about the veracity of
plaintiffs' May 1, 2014 expert report. The expert supposedly
discovered gaps in the defendant's personnel data regarding 334
employees. *See id.* at 3. Upon receiving the report, the
defendant "randomly selected a number of employees listed in the
[report] and reviewed the information the Board provided
plaintiffs' counsel in May 2012 regarding those employees." Opp.
to Mot. to Suppl., ECF No. 222 at 3. "In every single instance
[defendant] reviewed, the supposedly 'missing' data were indeed
provided." *Id.* at 3-4. In response, plaintiffs concede that they
"provided the court with inaccurate statistical data," but now
assert that the data is missing for 186 employees. *See* Reply in
Supp. of Mot. to Suppl., ECF No. 223 at 2, 3. Plaintiffs
are warned that they may be subject to sanctions if they continue to
provide "inaccurate" evidence or representations to the Court.

. . . unless the court in the exercise of its discretion has extended this period." Local Civ. R. 23.1(b).

Courts have also made clear that class certification comes first. "[*P*]*rior to reaching the merits*[, the Court] must conduct a . . . class certification analysis to ensure compliance with Rule 23 requirements." *Brewer v. Holder*, No. 8-1747, 2013 WL 5397841, at *5 (D.D.C. Sept. 27, 2013) (emphasis added); *see also Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 965-66 (11th Cir. 2008); *Chavez v. Ill. State Police*, 251 F.3d 612, 629-30 (7th Cir. 2001). Plaintiffs' reliance on *International Brotherhood of Teamsters* is misguided. *See* Mot. at 13-14. That case held only that courts must address the merits before addressing individual relief. *See* 431 U.S. 324, 361 (1977). The Court thus appropriately began with class certification.[11]

**C.  Plaintiffs' Discovery Arguments Are Meritless.**

Plaintiffs assert throughout their motion that they have been deprived of discovery responses to which they were entitled. Although raised in a motion for class certification, these arguments are merely renewed requests for reconsideration of the Court's October 10, 2012; July 8, 2013; and August 28, 2013

---

[11] Relatedly, plaintiffs wrongly assert that they are entitled to have a jury determine the facts at this stage. *See* Mot. at 14. A jury may be the ultimate fact finder, but "at the class certification stage . . . the judge is the decision maker." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011); *see also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir. 2008).

Orders. Moreover, plaintiffs' arguments have all been rejected by this Court (many on multiple occasions). *See supra* at 10–15. This Court's August 28, 2013 Order is equally applicable here:

> The motion either raises arguments that should have been, but were not, raised in plaintiffs' underlying motion [to compel] or their first motion for reconsideration, or merely repeats arguments that the Court has already considered and rejected. This approach, pursued by plaintiffs several times in this case, is a waste of judicial resources and the resources of defendant, a government entity. "In this Circuit, it is well-established that 'motions for reconsideration,' whatever their procedural basis, cannot be used as 'an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier.'" *Estate of Gaither ex rel. Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (quoting *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)).

Order, ECF No. 199 at 3–4.

## III. Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation marks omitted). Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, and a plaintiff "must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). This is done not by pleading compliance, but by "demonstrat[ing] . . . compliance . . . in fact." *Id.* (emphasis omitted).

## A.    Existence of a Class

"Although not specifically mentioned in the rule, an essential prerequisite of an action under Rule 23 is that there must be a 'class.'" Wright & Miller, *Federal Practice and Procedure* § 1760 (3d ed. 2014); *see also Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) ("It is axiomatic that for a class action to be certified a 'class' must exist."). Accordingly, a class may be certified only when "an individual would be able to determine, simply by reading the [class] definition, whether he or she was a member of the proposed class." *Bynum v. District of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003).

The plaintiffs propose to bring a class defined as:

> [A]ll persons [w]ho were non-managerial African American and/or Native American Secretarial and/or clerical support persons employed at the defendant Board at any time from 1989 to the present (the Class Period) and; or alternatively, at any time during the "class period" as defined by reference to provisions of the Lilly Ledbetter Fair Pay Act of 2009, (as amended), with respect to each such class member; [w]ho, because of racial discrimination, have been denied advancement or promotions for which they were equally or better qualified than their white counterparts who were selected over them one or more times, and/or who received lessor advances in salary or bonuses or other benefit, including retirement, and/or who have been, continue to be, or may in the future suffered disparate treatment, or systemic or other adverse impact, or systemic adverse treatment because of their race, African American or Native American, and/or who were similarly situated within the definition of F.R.Civ. Rule 23 to one or more of the plaintiffs herein, who were damaged, injured, or otherwise adversely affected including effects upon emotional and physical health, by the Board's racially

discriminatory policies and practices, or the use of race as a prohibited employment practice in decision making resulting in an individual or group adverse employment practice, as complained of herein; and/or by virtue of an unfair and lessor amount of pay in at least one paycheck, and who suffered lessor, fringe benefits, including retirement annuities, based in any part upon that unfair and lesser pay.

Mot. at 4–5 (typographical errors in original; emphasis omitted). This convoluted definition would render it difficult for a potential class member to decide whether they may be "a member of the proposed class." *Bynum*, 214 F.R.D. at 32.

The class definition also makes membership in the class contingent on an individualized merits determination: Whether the individual suffered "discrimination," "disparate treatment," or "systemic or other adverse impact, or systemic adverse treatment." Mot. at 4. This is problematic because "[u]sing a future decision on the merits to specify the scope of the class makes it impossible to determine who is in the class until the case ends." *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 895 (7th Cir. 2012); *see also Williams v. Glickman*, No. 95-1149, 1997 WL 33772612, at *4 (D.D.C. Feb. 14, 1997) (defining a class so that membership is contingent on a determination whether individuals suffered discrimination improperly requires the Court to "answer several fact-intensive questions").

**B.    Rule 23(a)**

Plaintiffs also failed to demonstrate their entitlement to

class certification under Rule 23(a), which requires that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

These requirements are known respectively as "numerosity, commonality, typicality, and adequate representation." *Wal-Mart*, 131 S. Ct. at 2550. Plaintiffs cannot establish commonality or typicality.[12]

### 1. Commonality

A plaintiff seeking class certification must establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The plaintiffs never clearly articulate why they believe they have demonstrated commonality. *See* Mot. at 6-7. According to the defendant, plaintiffs' proposed class fails to meet that standard because the discrimination they allege stems from an array of individualized decisions of low-level

---

[12] It is also not clear that plaintiffs are adequate representatives. That requirement seeks in part to ensure that "the representatives . . . appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997) (quotation marks omitted). Plaintiffs failed to participate in class discovery until this Court ordered them to. That this failure was due to the advice of the lawyer they selected to represent the class, whom the Court was forced to sanction personally for his actions, raises doubts as to the adequacy of their representation. Plaintiffs' submission of an untimely and admittedly "inaccurate" expert report adds to these doubts.

supervisors who operate with significant discretion to design subjective criteria for making personnel decisions.

The Supreme Court's decision in *Wal-Mart* guides the commonality analysis. In *Wal-Mart*, as here, the class alleged that the discrimination they suffered arose from "the discretion exercised by their local supervisors over pay and promotion matters." 131 S. Ct. at 2547. As here, the record established that "[p]ay and promotion decisions . . . are generally committed to local managers' broad discretion, which is exercised in a largely subjective manner." *Id.* (quotation marks omitted). The Supreme Court found that this did not demonstrate commonality, which requires that a class's "claims must depend upon a common contention" that is "of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. The *Wal-Mart* plaintiffs identified only a general policy "of allowing discretion by local supervisors over employment matters"—effectively "a policy against having uniform employment practices." *Id.* at 2554 (emphases omitted). Resolution of the legality of any one manager's exercise of discretion, then, would have no bearing on the legality of any other manager's action, absent "some glue holding the alleged *reasons* for all those decisions together." *Id.* at 2552 (emphasis in original).

The Supreme Court noted that such glue could be provided "if the employer 'used a biased testing procedure'" or upon "'[s]ignificant proof that an employer operated under a general policy of discrimination.'" *Id.* at 2553 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)).

In the wake of *Wal-Mart*, courts "have generally denied certification when allegedly discriminatory policies are highly discretionary and the plaintiffs do not point to a common mode of exercising discretion that pervades the entire company." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013) (quotation marks omitted). But "*Wal-Mart* did not set out a per se rule against class certification where subjective decision-making or discretion is alleged"; rather, "to satisfy commonality, a plaintiff must demonstrate that the exercise of discretion is tied to a specific employment practice, and that the subjective practice at issue affected the class in a uniform manner." *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 113 (4th Cir. 2013) (quotation marks omitted). The requisite "glue" may be provided by "unit[ing] acts of discretion under a single policy or practice, or through a single mode of exercising discretion." *In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*, 708 F.3d 704, 708 (6th Cir. 2013).

Plaintiffs provide no evidence that could support an inference that the discretionary decisions they challenge are tied

together by a common policy. Although they vaguely allege the existence of discriminatory policies and practices, Mot. at 6-7, the only general policy established by the record is the Federal Reserve Board's anti-discrimination policy. *See* Fields Decl. ¶ 8. The only other practice established by the record is that low-level managers set the standards and methods applicable to promotions, salary increases, cash awards, performance reviews, and career-transition plans. *See id.* ¶¶ 9-13, 16. This shows nothing but a general policy "of allowing discretion by local supervisors over employment matters," which is not enough on its own. *Wal-Mart*, 131 S. Ct. at 2554 (emphasis omitted).

Nor do the plaintiffs supply evidence that supervisors exercise their discretion in a uniform manner. The plaintiffs testified that the discrimination they allege was based on the subjective exercise of discretion by certain managers, and that many others exercised that discretion in a non-discriminatory manner. *See supra* at 7 n.3, 8 n.4. Plaintiffs provided limited anecdotal evidence of allegedly discriminatory treatment of one plaintiff, but these anecdotes further demonstrate that the plaintiffs complain of individualized decisions. Plaintiff Kathleen Matthews described in an affidavit approximately ten instances in which she alleges that she was passed over for promotions in favor of less-qualified Caucasian workers, and gave an apparently non-discriminatory explanation for one of

those decisions. *See* Declaration of Kathleen Matthews, ECF No. 212-8 ¶¶ 1-4, 7-9. The record thus indicates that some supervisors may have exercised their discretion to discriminate, others in an arbitrary but non-discriminatory manner, and still others in a manner plaintiffs felt was fair. There is therefore no evidence of a uniform "mode of exercising discretion." *In re Countrywide*, 708 F.3d at 708. Nor did plaintiffs establish that a single high-level manager was involved in many or all of the challenged employment decisions. *See Scott*, 733 F.3d at 114 ("*Wal-Mart* is limited to the exercise of discretion by lower-level employees, as opposed to upper-level, top-management personnel.").

Plaintiffs largely base their argument on statistical evidence. To be sure, statistical evidence may be a powerful tool in proving that a class suffered a common injury. *See, e.g.*, *Moore v. Napolitano*, 926 F. Supp. 2d 8, 29–30 (D.D.C. 2013) (certifying a class where plaintiffs submitted "statistically significant" evidence showing that, pursuant to a promotion policy, African-American employees were underrepresented in higher-level positions and were disadvantaged by the policy). Not all statistical evidence is relevant to commonality, however. "Statistical disparities alone," which might show that a particular group is underrepresented, "generally are not proof that . . . the class

as a whole . . . has been discriminated against." *In re Navy Chaplaincy*, No. 7-mc-269, 2014 WL 4378781, at *15 (D.D.C. Sept. 4, 2014). For example, "[i]f [a company] had 25 superintendents, 5 of whom discriminated in awarding overtime, aggregate data would show that black workers did worse than white workers—but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality." *Bolden*, 688 F.3d at 896.

Plaintiffs' statistical evidence falls far short of these requirements. To begin, Mr. Hampson, plaintiffs' statistical expert, appears to agree that he is not qualified. He has no degree beyond a bachelor's degree and has never testified as an expert witness. *See* Deposition of Richard Hampson ("Hampson Dep."), ECF No. 213-4 at 10:17–22, 13:4–15. Nor does Mr. Hampson have specialized education relating to the use of statistics regarding employment discrimination. *See id.* at 16:17–20. Indeed, he appears never to have prepared statistics regarding employment discrimination until becoming involved with this case, *id.* at 20:3–11, and when asked whether he was "claiming to be an expert in the preparation of employment discrimination statistics," he acknowledged that he "made no such specific claim." *Id.* at 27:12–14. As a result, his calculations did not use "any differential statistic to measure the statistical significance of the difference in pay between the plaintiffs and

white employees." *Id.* at 221:20-222:14. This failure to use anything but rudimentary comparisons renders it "impossible—as a statistical matter—to draw meaningful conclusions." *Love v. Johanns*, 439 F.3d 723, 731 (D.C. Cir. 2006).

Mr. Hampson's conclusions also appear to have shifted. Before Mr. Hampson submitted his report, plaintiffs' counsel represented to the Court in a filing that Mr. Hampson had conducted an initial study of the personnel data produced by the defendant and found that "no discernible difference in earnings figures were evident in the data." Pls.' Reply in Supp. of Mot. to Reconsider, ECF No. 193 at 12. Mr. Hampson then modified his methodology and testified conflictingly about these changes. First, he asserted that the initial analysis "wasn't a study," then that he didn't remember it, and later that he "vaguely remember[ed] discussing . . . that the data didn't seem to pop out, that it was consistently different." Hampson Dep. at 500:4- 506:5, 524:9-11.

Mr. Hampson's qualifications and apparently shifting views aside, his report does not even attempt to prove facts that would be relevant to commonality. Mr. Hampson compared the salaries of eleven of the fourteen named plaintiffs to hand-picked white employees who were hired in the same year as each plaintiff. Mr. Hampson terms these groups of individuals hired in the same year "cohorts," and purports to show that in each

cohort, the white employees' salaries exceed that of the plaintiff. Mr. Hampson admits, however, that this method cannot prove that anyone suffered discrimination other than the eleven named plaintiffs he tracked. *See* Hampson Dep. at 430:13-16; *id.* at 220:6-12. Most glaringly, he was asked "[t]here's nothing in your calculations that would shed light on whether different managers were making decisions different ways[,] [r]ight?" and responded "[t]hat's correct." *Id.* at 227:21-228:7. Mr. Hampson thus admitted that he cannot provide the necessary "glue" to hold together the individualized claims of the class. Even if it had provided that glue, Mr. Hampson's analysis addressed only one of the five practices challenged by the class. He did not analyze anything related to the class members' experiences with promotions, cash awards, performance reviews, or career-transition agreements. *See* Hampson Dep. at 213:8-217:5. Mr. Hampson's analysis thus provides nothing to support a finding of commonality.[13] Accordingly, plaintiffs have failed to meet their

---

[13] Mr. Hampson's methodology also appears to have been manipulated to achieve the results sought by the plaintiffs. Indeed, Mr. Hampson appeared to testify that he did not remember whether his methodology was his idea or that of plaintiffs' counsel. *See* Hampson Dep. at 154:7-155:14. Whoever came up with the idea, Mr. Hampson's analysis was conducted to ensure that the comparisons were favorable to the plaintiffs. Mr. Hampson excluded from his analysis three of the named plaintiffs; excluded potential Caucasian comparators who were lower paid, but appeared to share many characteristics with the named plaintiffs; and included higher-paid Caucasian employees who

burden of demonstrating that the class raises even one common
question.

*2. Typicality*

Plaintiffs also fail to demonstrate that "the claims or
defenses of the representative parties are typical of the claims
or defenses of the class." Fed. R. Civ. P. 23(a)(3). A class
representative satisfies the typicality requirement if the
representative's "claims are based on the same legal theory as
the claims of the other class members" and her "injuries arise
from the same course of conduct that gives rise to the other
class members' claims." *Bynum*, 214 F.R.D. at 35. Put another
way, a representative's claims are typical of those of the class
when "[t]he plaintiffs allege that their injuries derive from a
unitary course of conduct by a single system." *Marisol A. v.
Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997).

Plaintiffs' claims lack typicality for the same reason they
lack commonality: their claims are not about "a unitary course
of conduct by a single system," *id.*, but individualized courses
of conduct by dozens, if not hundreds, of low-level managers.
*See In re Navy Chaplaincy*, 2014 WL 4378781, at *17 (where
plaintiffs failed to show "that their claims have even a single
question of law or fact in common with any of the absent class

---

worked entirely different jobs. *See* Report of Mary Dunn Baker,
ECF No. 213-3 at 4, 10–12.

members," typicality is lacking because "it would be impossible to conclude that their claims arise from the same course of events") (quotation marks omitted). Moreover, plaintiffs challenge an array of personnel decisions related to five different employment benefits, yet each plaintiff experienced different treatment and many did not claim to have been discriminated against in connection with one or more of those benefits. *See supra* at 5–6 & n.2. Accordingly, the putative class lacks typicality.

**C.   Rule 23(b)**

Plaintiffs also failed to demonstrate entitlement to certification under any provision of Rule 23(b).

*1.   Rules 23(b)(1) and 23(b)(2)*

The *Wal-Mart* Court was unanimous in holding that class actions seeking backpay under Title VII do not belong under Rule 23(b)(2). *See* 131 S. Ct. at 2557; *id.* at 2561 (Ginsburg, J., concurring in part and dissenting in part). The Supreme Court reserved judgment on whether Rule 23(b)(2) may be available where monetary relief is "incidental to the injunctive or declaratory relief," *id.* at 2557, but made clear that claims for backpay under Title VII are not incidental because the employer "is entitled to individualized determinations of each employee's eligibility for backpay," including the ability to "show that it took an adverse employment action against an employee for any

reason other than discrimination." *Id.* at 2560–61. The Court found that this limitation applies equally to a (b)(1) class because it, like a (b)(2) class, is a mandatory class that does not permit a class member to opt out. *See id.* at 2558. Because plaintiffs' proposed class brings claims for backpay, it may not be certified under Rules 23(b)(1) or (b)(2).

   *2.   Rule 23(b)(3)*

   Rule 23(b)(3) provides that a class may be certified where "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry is similar to the commonality inquiry, but "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432. Here, the analysis is simple: the plaintiffs have not identified a single common issue. *See supra* Part at III.B.1. In the absence of any common issue, it cannot be said that common issues predominate. Accordingly, a (b)(3) class is also inappropriate.

**IV. Conclusion**

For the foregoing reasons, the Court **DENIES** plaintiffs' motion
for class certification and **DENIES** plaintiffs' motion to
supplement the record. An appropriate Order accompanies this
Memorandum Opinion.

    **SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
              **United States District Judge**
              **September 29, 2014**